# MERRIMACK,

## JULY TERM, A. D. 1850.

## BROWN & a. v. MARSH & a.

After the passage of the Act of July 2d, 1841, the town of Henniker, in pursuance of a vote to that effect, took the greater part of the surplus revenue deposited with the town, and appropriated it to pay the debts and defray the expenses of the town. In the month of March, 1846, the town voted that the interest on the surplus revenue, be divided, annually among the tax-paying polls, in part payment of their several poll taxes. For the money taken from the surplus revenue, the selectmen gave the notes of the town; and at the various settlements with the committees for auditing the town accounts, the interest was indorsed on these notes, though no interest was in fact paid. *Held*, that the surplus revenue fund, having been applied to pay the debts and defray the expenses of the town, was expended, and ceased to exist; and no interest could accrue upon it, although the town might have intended to preserve the fund entire, and although the mode in which their accounts were kept might show that such was their intention.

*Held*, also, that raising money to pay the interest on the fund, when no fund existed, was merely raising money for the purpose of distribution, which the town could not legally do; and the officers of the town were restrained, by injunction, from proceeding to collect the tax assessed for that purpose.

IN EQUITY. The following case was stated in the bill.

On the first day of April, 1846, the orators resided in the town of Henniker, where they still live, and were liable, respectively, to pay their proportion of all the legal taxes assessed in the town since the last day of May, 1846.

At a meeting, duly holden on the 2d day of Feburary, 1837, the town voted to receive from the state their proportion of the surplus revenue, and appointed John Campbell their agent for that purpose. Campbell was also appointed treasurer, for the purpose of holding so much of the surplus revenue as he might

receive from the state ; and it was also voted that he should collect annually, and pay over to the town, the interest accruing thereon.

It was also voted that the money over and above what might be lent to the town of Henniker, should be lent to persons residing in Henniker.

In pursuance of his authority, Campbell received from the Treasurer of the State, the sum of $4,846.26, for the use of the town of Henniker, and subsequently lent a large part of it to individuals.

At the town meeting, held in March, 1842, the town voted to raise $2,000. In March, 1843, they voted to raise $1,500. In March, 1844, they voted to raise $1,500. In March, 1845, they voted to raise $2,000 ; and at each of the above-mentioned meetings, they voted, that the remainder of the sum, needed to defray the expenses and pay the debts of the town, for the ensuing year, be taken from the surplus revenue.

At the town meeting in March, 1844, it was voted, that the selectmen should receive from the town agent, who had charge of the surplus revenue, the securities in his possession, and deposit them in the treasury of the town ; and should then discharge the agent.

On the 18th day of February, 1837, the selectmen received of Campbell the agent, the sum of $1,615.42, and applied it to pay the debts of the town ; of which sum, $1,065.16 were repaid from other funds of the town.

On the 20th day of February, 1840, the selectmen received of the agent the further sum of $500, and applied it to the use of the town ; of which sum $200 were afterward repaid.

On the 27th day of November, 1841, the selectmen received of Imri Woods, who was then town agent, the sum of $200, and applied it for the benefit of the town.

It is alleged in the bill, that these sums were received by the selectmen in behalf of the town, under the pretence that they were borrowed by the town, of the agent ; and that the selectmen, to support this pretence, gave to the agent a note signed by them as selectmen, for each of these sums.

In each of the years above-mentioned, the selectmen exhibited to the town an account of the receipts and expenditures of the town ; in which the sums received of the agents were credited to the town, and the expenditures thereof, for the use and benefit of the town, were duly accounted for ; and these accounts were duly accepted and approved by the town.

In pursuance of the vote of March, 1842, the selectmen received of Woods $1,018.94, and in pursuance of the vote of March, 1843, they received of him the sum of $1,233.43. These sums were, in the belief of the orators, part, of the surplus revenue, and were applied to defray the expenses of the town for those years respectively.

In pursuance of the vote of March, 1844, the selectmen received of Woods the securities for the loan of the surplus revenue, deposited them in the treasury of the town, and discharged the agent. They afterwards received from the town treasurer $928.07, which was a part of the surplus revenue. In pursuance of the vote of March, 1845, they received of him $128.70, which was also a part of the surplus revenue. These sums were applied to pay the expenses of the town.

In the years 1842, 1843, 1844, and 1845, respectively, accounts were presented to the town, in which the sums received from the surplus revenue were credited to the town, and accounted for, and these accounts were duly accepted and approved by the town. These sums amount to $4,359.41 ; leaving unexpended of the surplus revenue, the sum of $486.85. The bill alleges that, of the surplus revenue, this sum and no more remained unexpended, in possession of the town on the 1st day of April, 1846, and that it was then due the town, from individuals to whom it had been lent.

At the annual meeting in March, 1846, the town voted that the interest on the surplus revenue, deposited with the town, whether in the hands of the town, or lent to individuals, be annually divided among the tax-paying polls, in part payment of their several poll taxes, until the town should otherwise order.

The bill then alleges, that the orators hoped that the selectmen would have divided among the tax-paying polls, the interest of

the balance of the surplus revenue then remaining unexpended ; being the aforesaid sum of $486.85, and no more.  But that the selectmen, (who, with the collector of taxes, are the defendants in this bill,) have proceeded to divide among the tax-paying polls, a sum equal to the interest of the whole surplus revenue, originally deposited with the town ; without any regard to the fact, that the whole surplus revenue, excepting the sum of $486.85, had, on the first of April, 1846, been entirely expended.  For the purpose of making such division, the selectmen issued their warrant to the collector, requiring him to collect the taxes therein specified, of the persons named in the list ; and when the same should be collected, to pay " to each of the tax-paying polls named in the list, the sums set against their names, to the left hand of their taxes in said list."

In the collector's list, each tax-paying poll is assessed the sum of eighty-nine cents ; amounting in the whole to $290, or thereabouts, being the amount of the interest, for one year, of $4,846.26, which was the amount of the surplus revenue deposited with the town.  But the bill alleges, that the interest of the unexpended balance of the surplus revenue, amounts to $29.21 only.  The collector proceeded to collect the taxes assessed, and to pay over to each of the tax-paying polls the sum of eighty-nine cents ; thereby, as the bill alleges, in effect, illegally compelling the orators, and other persons in the town, who are taxed for ratable estate, to pay a part of the taxes which should be paid by the persons who are taxed for their polls ; and assessing upon the holders of taxable property, and compelling them to pay, a tax to be distributed among the tax-paying polls ; in violation of the constitution and laws of the state, and to the utter subversion of all the rights of property.

The bill prays, that the defendants may be enjoined from paying to the tax-paying polls any greater sum than the interest of the unexpended balance of the surplus revenue, or from allowing to them, in any manner, the sums set against their names, respectively, on the list of taxes in the hands of the collector.

The answer alleges, that the sums taken from the surplus revenue were borrowed, by the selectmen, of that fund, to

defray town charges ; and that the town never, in any manner, authorized the selectmen to make a final disposition of the surplus revenue, or of any part of it ; that the selectmen have never attempted to do so, but have pursued the custom usually adopted by the selectmen of the town, before the receipt of the surplus revenue. And, as formerly, the selectmen of the town have, without any formal vote of the town, borrowed money and pledged the note of the town for its repayment, so, acting in good faith, under the instructions of the town, they borrowed, for the town, such portions of the surplus revenue, as, from time to time, they were directed to borrow, by the votes of the town. But in order to keep the fund good, they gave to the agent the notes of the town, for the sums received of him. The bill then alleges, that the town has never ratified any act of the selectmen which might operate as a final disposition of any part of the surplus revenue ; that the selectmen, before each annual town meeting, exhibited an account of the receipts and expenditures of the town, showing the sums of money borrowed and how they were expended ; that the respective auditing committees examined the accounts, and ascertained the amount of interest paid by the selectmen upon the sums borrowed from the surplus revenue, and caused it to be indorsed upon the notes given to the agent by the selectmen ; that whenever a balance was found due to the surplus revenue fund, it was adjusted and paid to the fund by the selectmen, acting under the instructions of the auditing committees ; that the fund was treated as it would have been had it been the property of an individual creditor of the town ; that the reports of the auditing committees were accepted by the town, and that in this way only, has the town ever passed upon or approved of the doings of the selectmen, in the premises. The answer then states that when the selectmen received from Woods, the agent, the surplus revenue fund and the securities belonging to it, and deposited them in the town treasury, it was intended that the town treasurer should be the agent to manage the fund, and that the other agency, from motives of economy, should be dispensed with ; that the treasurer kept an account of the disposition of the surplus revenue fund separate from the

7*

general accounts of the treasury; and that the auditing committees regarded, and acted upon this account, as separate and distinct from any other account; and that the town treasurer has annually received compensation for his services, as agent for the surplus revenue fund, apart from his compensation as town treasurer; that the intention of the town, by their votes, has always been, merely to borrow the fund, and not to appropriate it; and that it was not intended to give the selectmen any further power than merely to borrow it; and all the acts of the town have been intended solely to carry out these views. In order further to show the intention of the town, the answer then stated, that, at a meeting, held on the 30th day of November, 1846, the following votes were passed by the town : —

1st. That the town approve the course pursued by the selectmen (the defendants,) under the vote of the town, at the last annual meeting, in relation to the interest arising from the surplus revenue deposited with the town.

2d. That when the town voted, at the last annual meeting, to divide the interest on the surplus revenue deposited with the town, whether in the hands of the town or lent to individuals, they meant the interest on the whole sum originally deposited with the town.

3d. That the town ever has considered and treated the whole of the surplus revenue originally deposited, as a fund subject to the control of the town; and that they prefer so to consider and treat it now.

4th. That the town has never intended to use up any of the principal of said fund, but simply to appropriate the interest on the same ; and whenever any portion of the interest has been received by the selectmen, from the agent or treasurer, for any purpose whatever, it has been taken with the express intention and expectation that the town was annually to pay the interest on the sums so taken, the same as an individual, and that the sums so taken were liable to be repaid to the agent or treasurer, when the town should so vote.

5th. That the town has never approved the settlement of the town accounts, any year since the surplus revenue was deposit-

ed, in any other manner than with the understanding that the whole of the principal of the fund had been kept good, and remained subject to the control of the town.

The answer then admits that the defendants, as selectmen, divided, as alleged in the bill, a sum equal to the interest of the surplus revenue originally deposited with the town, among the ratable polls, and directed the collector to pay to each of the tax-paying polls the sum of eighty-nine cents; which he proceeded to pay, as alleged in the bill.

The cause was submitted to the Court for decision, upon the bill and answer, and upon the following facts, agreed to by the parties.

No money taken from the agent or treasurer, belonging to the fund, has, since the vote of 1841, been repaid to said agent or treasurer, nor has any money actually been paid to the agent or treasurer, for interest on the money so taken. But the interest on the fund having been ordered by the town to be divided among the ratable polls, the collector was instructed by the selectmen, in the collection of taxes, to allow each person paying a poll tax, his proportion of the interest on said fund, which was set against each name respectively in the tax book. The treasurer was charged with the whole amount of the tax annually, and credited by the gross amount thus allowed, and the proportion of interest accruing on the town notes was annually indorsed, by the auditing committee, upon said notes respectively. The several warrants for the annual meetings, in each year, contained articles in substance as follows : — " To hear the report of the committee chosen to audit the town accounts ;" which committee reported to the town, in each year, substantially in the form following; which is a copy of the record of their report for the year 1842, and which reports were severally accepted by the town in each year.

" 3d. Voted to accept the report of the auditing committee, which is as follows : —

We, the undersigned committee, appointed by the town of Henniker to audit the accounts of said town, have attended to

Brown *v.* Marsh.

the duty assigned us, and find that the selectmen, town treasurer, and the agent to take charge of the surplus revenue have, each and all of them, fairly accounted for all taxes, moneys, and securities with which they were found chargeable." The committee, at the time of the settlement, made a full record of all the town accounts, in the treasurer's book.

*Perley,* for the orators. This fund was invested in notes, and had no existence except in the notes. It was, in truth, disposed of, and was then as much out of existence as if it had been lost; and the town then ratified what had been done, assented to taking the property and paying their debts with it. We cannot see how any interest can be divided when there is no principal on which it accrues. By the Rev. Stat. ch. 8, § 3, the town were authorized to dispose of the money as they chose. They were not trustees of the fund, bound as such to account for it to any other beneficiary. The answer does not deny that the fund was applied to the payment of debts, by a vote of the town.

Now what effect can be given to all these careful indorsements, and to this mode of accounting, by which the town settles with itself? They certainly do not preserve a fund, which has substantially been disposed of. They show merely how the accounts were kept between the different agents of different funds. The town cannot contract with itself, for there would be no parties. The town have changed the proportion of taxes, and have undertaken to raise money by a tax on property to pay the poll taxes, which they cannot legally do. It is of no consequence what names are given to all these transactions, for the substance is, that the town have attempted to raise money for the purpose of distributing it.

No *custom* of the town is shown to have existed, as stated in the answer; and if it had been shown, it could not alter the law.

If this fund exists now, it may again be distributed without limit, provided the town may make entries on account books, and pass resolutions showing their intentions, and such resolutions are held to have any effect.

*Pierce & Minot,* and *Smith,* for the defendants.

If the fund is already disposed of, we agree to the reasoning of the counsel for the orators.  But we say that the fund still exists.  The complaint of the bill is, that the interest of the sur-plus revenue is to be divided among the tax-payers; disregard-ing the fact that the fund had been appropriated, and that the defendants intended to divide, not only the interest of the unex-pended balance, but a sum equal to the interest of the original fund.

There is nothing in the case of the *Baptist Society* v. *Wilton,* 2 N. H. Rep. 508, adverse to us.  That case settled nothing but the construction and effect of a grant, by the Masonian pro-prietors, of a share in a township, for the ministry.  It was there held that a grant of a share for the ministry vested the fee of the lands in the town, and that where a share was sold and the proceeds set apart as a fund for the ministry, a portion of the inhabitants, incorporated as a religious society, could not main-tain an action to recover a part of the interest of the fund.

We admit that the mere form of the transactions is not to be regarded, but we have shown what was actually done.  There is no room for any implication against us, while the papers show the facts.  The act of January 13th, 1837, section 3, prohibited the town from disposing of the fund, but allowed them to appro-priate the interest.  The act of July 2d, 1841, authorized them to dispose of the principal.  Rev. Stat. ch. 8, § 3.  When this money was received from the State, the selectmen lent some of it to the town, and the remainder to individuals.  Before the act of 1841, the town had borrowed of the fund, $2,515.42; and for this the town were responsible as borrowers.  They had not expended the money, and had not done any act in contraven-tion of the policy of the act of 1837.  The case of *Davis* v. *Bath,* 5 Shepley, 141, decides that an appropriation of the fund to town purposes, does not cause it to cease to exist, but that it still exists, and may be distributed *per capita.*

We could not legally have distributed the fund, as such, with-out an article in the warrant for that purpose ; and this is a dif-ferent matter from applying it to those town purposes for which

money might be raised by taxation. But no meeting has ever been held for the purpose of disposing of the fund.

*Perley*, in reply. The town owned this money absolutely, and did not hold it in trust after 1841. It was not like a school fund, or a minister's fund, or any other fund for the purposes of a trust. It was merely money belonging to the town. Before 1841 it was a trust fund ; and if the town had spent it, they would have been bound to replace it. The case in 5 Shepley, goes on the ground that, between the first and second laws of Maine on this subject, it was a trust fund. The town of Henniker might have spent this money, without any article in the warrant for that purpose. It cannot be law, that after the fund was disposed of, it still existed, until there was an express vote on the subject. Now we say that the money was disposed of and spent, as much as any money could be spent ; and that the town have no right to raise money in the name of interest upon an ideal fund.

GILCHRIST, C. J.* In accordance with the votes of the town, from March, 1842, to March, 1845, both inclusive, a part of the surplus revenue was applied, in each year, to defray the expenses and pay the debts of the town. The sums thus taken amounted to $4,359.41 ; and the selectmen, for each year, exhibited to the auditing committee, and through them to the town, an account of receipts and expenditures, which was allowed and approved by the town. In the month of March, 1846, the town voted that the interest on the surplus revenue be divided, annually, among the tax-paying polls, in part payment of their several poll taxes ; and at the time of this vote there remained on hand, of the surplus revenue, an unexpended balance of $486.83. The selectmen made a list of taxes, and directed the collector to levy the amount, and pay " to each of the tax-paying polls the sums set against their names." These sums amount to $290, being the interest on the whole surplus fund for one

* Perley, J. having been of counsel, did not sit.

year, instead of the interest on $486.85, which is $29.21 ; and the bill prays for an injunction to restrain the defendants from paying any more than this sum, or from allowing any larger sum than this to the tax-paying polls, in any way.

Whenever any part of the surplus fund was taken by the town of Henniker, the note of the town, for the amount, was given to the agent; and the interest, although not paid, in fact, was indorsed upon the notes, annually. When the town received the notes from the agent, they were deposited with the treasurer, and kept by him, as they had been kept by the agent; and separate accounts of the receipt and disposition of the surplus revenue were made and approved by the town.

By the act of January, 1837, providing for the receipt of the surplus revenue, each town was accountable for the money, whenever it should be called for by the treasurer of the State. The towns were prohibited from appropriating or spending it; but they might lend it, and appropriate the interest as they should deem expedient. This provision is contained in the 3d section of the act. The statute of July 4th, 1838, repealed this section, and authorizes the towns to lend the money, in sums not less than twenty-five dollars, or to appropriate it to any purpose for which towns might lawfully raise money. By the act of July 2d, 1841, the towns were empowered to make such disposition of it, as they should, by a major vote, determine; and the 3d section of ch. 8, Rev. Stat. authorizes them to dispose of it, as should be deemed equitable and expedient.

The act of 1841 gave the town unlimited power over this money. They had, before that time, taken, or borrowed, or expended, (whichever term may be proper,) the greater part of it, and had applied it to pay the debts and defray the expenses of the town. Whatever debt, by the acts prior to 1841, the town owed to the fund, or under whatever legal obligation they were by reason of their accountability for the fund, by the act in question they were relieved from all responsibility on account of it. They paid their debts with the money taken from the fund, and this money they were not bound to repay. Now, in whatever form the accounts were kept, whatever contracts the town

chose to make with itself, through its own agents, we must look at the substance of the transaction. The form of paying interest, when none was paid, in fact; the form of a note made by the town, payable to its own agent, and kept in the possession of the town, through its agent, when no power known to the law could have enforced the payment of it; and the form of keeping separate accounts relating to this fund, which could not alter the nature of the transaction; all these, in truth, amount to nothing. A fund once existed. The town lawfully took it, and lawfully paid its debts with it. The fund then ceased to exist. It was disposed of, and the town had no farther power over it, and could not derive any income from it. This is the whole story, and no language can make it plainer; and no system of keeping accounts, and no intentions of the town, however honest they might have been, as they undoubtedly were, can give a different complexion to the affair, or cause it to express a different idea, to those who look through the forms in which it is enveloped, and regard, as it is our duty to do, the substance of the transaction.

It is not contended that the town is authorized to raise money, by a tax on property, for the purpose of distributing it among any part of the inhabitants. As our opinion is that the fund has ceased to exist, the defendants must be regarded as attempting to raise money for an illegal purpose.

The case of *Davis* v. *Bath*, 17 Maine Rep. 141, has been referred to by the counsel for the defendants, as an authority in support of his position. It appears that by the statute of Maine, of the 8th of March, 1837, the towns were empowered to appropriate the surplus revenue in their possession, for the same purposes for which they had a right to raise money by taxation. By virtue of this act, the town appropriated $7,000 of this money for building a town-house and enlarging their almshouse. It was not contended that such an appropriation of the money was not authorized by the act of 1837. The statute of Maine, of 1838, empowered the towns to distribute the money *per capita*, or to appropriate it to any other purpose for which they might raise money by taxation. The town then " voted to distribute, *per capita*, the surplus money belonging to the

town." The action was brought to recover the plaintiff's proportion of the surplus money, under this vote. It appears to us that the true question in that case was, how much surplus money then belonged to the town, which they could distribute under this vote, and the act of 1838; and that the lawful appropriation of $7,000 of this money, under the act of 1837, deprived the town of all power of distributing so much of it *per capita;* because by their own legal act, that sum had been expended, and had ceased to exist, as a part of the surplus revenue. But the court were of a different opinion, and held that the town was bound to distribute the whole sum received of the state, whatever disposition had been previously made of a part of it. With the reasoning of the court we cannot concur; and therefore we cannot regard the decision as an authority upon the question before us.

The judgment of the Court is, that an injunction issue, according to the prayer of the bill.