## BROWN v. CONCORD. { Mar. 20, 1876.

*Water precinct—Expense of fire department—Injunction—Collection of taxes, when restrained.*

The city of Concord was authorized by an act of the legislature to construct water-works for the purpose of introducing and distributing through the more compact parts of the city a supply of water for extinguishing fires, and for other purposes. The city was further authorized to establish a water precinct, and to levy the taxes necessary to defray the expense of constructing, maintaining, and operating said water-works, upon the taxable inhabitants and property of the precinct, and not on any other part of the city. The city, having established a water precinct, constructed water-works at an expense of $300,000, with money borrowed for the purpose, and for which the bonds of the city were issued. In April, 1874, the city councils voted to raise, by taxation of the polls and ratable estate of the entire city, including the polls and ratable estate outside the limits of the precinct, the sum of $7,400 for water for the use of the fire department of said city, and proceeded to collect said sum, intending to apply and pay it over to the board of water commissioners having the charge and control of the water-works, for water for the fire department, being the sum of $50 for each hydrant within the precinct. *Held,* that this would be a violation of the terms of the act requiring all taxes, levied for the purpose of defraying the expense of constructing, maintaining, and operating the water-works, to be levied and assessed upon the taxable inhabitants and property of the precinct, and not on any other part of the city; and therefore that the city should be enjoined from paying money so assessed and collected for that purpose.

This court has no jurisdiction by bill in equity to restrain a town, or the collector thereof, from the collection of a tax which is illegally assessed, as the party has a plain and adequate remedy at law. *Savings Bank* v. *Portsmouth,* 52 N. H. 17.

FROM MERRIMACK CIRCUIT COURT.

BILL IN EQUITY, filed by John S. Brown and six others, residents of Concord, having taxable property outside the limits of the water precinct in said city, against the city of Concord, and Samuel C. Eastman, its treasurer, and William H. Allison, its collector, praying that the defendants be restrained from collecting and from paying out of the treasury of said city certain taxes claimed to have been illegally assessed. The cause was submitted upon bill and answer. The facts

material to be considered sufficiently appear in the opinion of the court.

*E. B. S. Sanborn* and *H. Bingham*, for the plaintiffs.

*Sanborn & Clark* and *J. Minot*, for the defendants.

SMITH, J.   By the act of 1871, ch. 69, the city of Concord was empowered to construct, manage, and maintain suitable water-works in said city, for the purpose of introducing and distributing through the more compact parts of said city an adequate supply of water, for extinguishing fires, and for the use of its citizens, and for other purposes. By section 6 of the act, the city was authorized to borrow such sums of money on the credit of the city as might from time to time be decreed advisable, for the purpose of defraying the expense of constructing, maintaining, and operating said water-works, and to issue the notes or bonds of the city therefor; and also to levy such taxes as might at any time be deemed advisable for the same purpose, or for paying any sums borrowed therefor. The city was further authorized, at any time before commencing the construction of said works, to establish a water precinct in said city, which might be altered from time to time thereafter, and all taxes levied, as provided in said section, during the time the precinct might exist, are to be levied and assessed upon the taxable inhabitants and property of the precinct, and not on any other part of the city.

Agreeably to the provisions of this section, the city established a water precinct, comprising the more compact parts of the city—that portion to be principally benefited thereby—before constructing said works.   The works have since been constructed at an expense exceeding $300,000, with money borrowed for the purpose, and for which the bonds of the city have been issued.

It thus appears from the act (section 1) that the object of the statute was, to enable the city to " introduce and distribute through the more compact parts an adequate supply of water for extinguishing fires, and for the use of its citizens, and for other purposes;" and (section 6) that " the expense of constructing, maintaining, and operating said water-works" was to " be levied and assessed upon the taxable inhabitants and property of the precinct, and not on any other part of the city."

The plaintiffs are residents and tax-payers in said city, and have ratable estate solely or mainly outside the precinct.   They complain that the city councils, on the fourth of April, 1874, voted to raise, by taxation of the polls and ratable estate of the entire city, including the polls and ratable estate in the territory of said city outside the limits of the precinct, the sum of $7,400, for water for the use of the fire department of said city, and that upon the polls and ratable estate of the plaintiffs their proportion of said sum of $7,400 has been levied and assessed and committed to the collector for collection, who is collecting

the same and paying it over to the city treasurer, who intends to apply and pay out the same for interest upon the notes and bonds issued to cover the cost of the construction, maintenance, and operation of said water-works, for the current expenses of maintaining and operating the same, for other expenses incident to and growing out of said water-works, and in part payment of the cost of constructing and maintaining the same; and in this the plaintiffs charge that the city is acting illegally and fraudulently.

The defendants deny that the city or its officers have acted illegally or fraudulently in this matter. They admit that the city councils voted to appropriate said sum of $7,400 for water for the fire department, and that the city and its officers intended to apply and pay out all of said sum to the board of water commissioners appointed under said act, for water for the fire department of the city, and for no other purpose whatever; and they deny that any portion of said sum has been paid out for any of the purposes mentioned in the bill.

The vote of the city, of April 4, 1874, to raise $59,000 on the polls and ratable estates within the city, to defray the necessary expenses and charges of the city for the then ensuing year, means the debts legally due from or the expenses properly incurred by the city. *Ainsworth* v. *Dean*, 21 N. H. 407. There is nothing, therefore, in the form or language of the vote improper or illegal. But the plaintiffs' position is, that the appropriation of $7,400 for water for the fire department is in fact an appropriation to meet the deficiency in the expense of operating the water-works, and the interest on the debt contracted in their construction. Cities undoubtedly have the power to appropriate money for the protection of property against fire—Gen. Stats., ch. 44, secs. 11, 14; and an appropriation to be expended throughout the city, without reference to the limits of the water precinct, cannot be illegal. Section 5 of the act above referred to authorizes the city to contract with individuals and corporations for supplying them with water, and to make such contracts and to establish such regulations and tolls for the use of water as may from time to time be deemed proper. The defendants claim that by virtue of this power the board of water commissioners have established rates and tolls for the use of water for the different purposes for which it may be desired, and among them is a rate and toll of $50 per annum for each public hydrant; and that the sum which it was intended to pay over to the board of water commissioners was the amount of that rate for each public hydrant, as established and actually in use by the city,—most of the hydrants being within the limits of the precinct, but several of them being outside those limits. It is contended that the payment thus intended to be made had reference solely to the actual amount of the tolls for the hydrant service, precisely as would have been the case with any other water-taker, and that it had no reference whatever to the pecuniary results of the water-works to the precinct; that the terms of the act and the intention of its provisions authorize such payment, and that such payment would be just; that the fire department of the city embraces its whole territory,

and therefore that all the expenses of the department in all sections of the city should be a general charge on the city treasury ; that the intended payment would do no injustice to the sections of the city outside the precinct, because the charge for water from the water-works only takes the place of the charges which otherwise would arise to the city treasury from the construction and maintenance of reservoirs and other means for obtaining a supply of water, and from engines and men to throw the water. It is further contended by the defendants that the construction and effect of the act, as claimed by the plaintiffs, would work great injustice to the water precinct, for it would impose on the precinct all the expense of providing water and hydrant service within its limits, without any contribution whatever by other sections of the city in any way therefor, and at the same time leave the precinct still liable to contribution for all the expenses of engine service and water supply in those sections of the city which still remain a charge on the city treasury ; and, further, that the precinct would maintain the hydrants which are without its own limits, and supply the necessities of other sections of the city.

This position of the defendants is only partially true. The hydrants, and the supply of water furnished in consequence of the construction of the water-works, would be of no avail without the means and apparatus for using them. For this purpose it will no doubt be admitted there are furnished, at the expense of the whole city—within the precinct as well as without — steamers, engines, hose-carriages, hose, firemen, horses, engine-houses, besides the other numerous articles that go to make up the complete equipment of a well organized fire department. Such facilities are necessarily, from proximity of location, always more serviceable to the compact parts of a city or town than to its more sparsely settled portions. It is claimed that the sections known as Fisherville, West Parish, and East Parish have each its fire company, engine, and other fire apparatus, provided for and sustained by the whole city. This is not denied, and it may doubtless be viewed as in some sort a compensation for their share in the burden of supplying and maintaining a more complete and expensive department for the compact part of the city.

The city councils have undertaken to assess the whole city for the water furnished to the fire department within the precinct. In the first place, it would seem the sum to be so assessed must be determined upon very insufficient data. How is the real value of the water so supplied to be ascertained ? The commissioners have fixed it at $50 for each hydrant. Increasing the number of hydrants indefinitely, increases the expense in the same proportion. By what other rule it is assumed that the sum of $7,400 is a fair equivalent for the water furnished by the precinct as compared with expenditures for reservoirs in other sections of the city does not appear. There are intrinsic difficulties in arriving at a just valuation.

Again : the whole city is the owner of the water-works, although practically it is only trustee for the precinct, which ultimately

bears all the losses, if any. The title is in the city; but the precinct, alone being benefited by the works, is bound by law to pay the expense of their construction and operation. How, then, can the city buy water of itself—water which it owns—and then tax its polls and ratable estate to pay for it? The city clearly has the right, under section 5, to make contracts for the supply of water with individuals and corporations, and to establish proper regulations and tolls for the use of water; but it is clear the city cannot contract with itself, nor establish tolls for the water consumed by itself. It is of no consequence how its accounts are kept, nor what contracts it makes with its own agents: we must look to the substance of the transaction. *Brown* v. *Marsh*, 21 N. H. 91, 92. The water commissioners are the officers of the whole city and not of the precinct, are elected by the city councils, and, so far as they are answerable for their conduct, are answerable to the city and not to the precinct. The precinct has no organization beyond a territorial existence established by the city councils, its boundaries subject to be modified, enlarged, or altered from time to time as may be deemed advisable. It has no officers who speak and act for it, and it can neither sue nor be sued. Undoubtedly the inhabitants of the precinct have rights, which would be protected in equity upon a proper case being presented; but I think it is clear that the precinct has no claim for water furnished the fire department which can be enforced in a suit either at law or in equity. The fire department of the city embraces its whole territory, and all the expenses of the department in all sections of the city must therefore be a general charge on the city treasury. However just or equitable such a claim may be, it certainly is one which there is no way of enforcing; and I think it must be clear the city councils cannot, in this indirect way, accomplish what cannot be done directly. The form of collecting such a claim by an assessment upon the whole city cannot alter the nature of the transaction. To borrow the appropriate language of GILCHRIST, C. J., upon a similar occasion,—" This is the whole story, and no language can make it plainer ; and no system of keeping accounts, and no intentions of the town, however honest they might have been—as they undoubtedly were—can give a different complexion to the affair, or cause it to express a different idea to those who look through the forms in which it is enveloped, and regard, as it is our duty to do, the substance of the transaction." *Brown* v. *Marsh, supra,* 92.

It will be noticed that by the language of the enabling act of 1871, section 1, the objects for which the city was authorized to construct its water-works were "for the purpose of introducing and distributing through the more compact parts of said city an adequate supply of water *for extinguishing fires,* and for the use of its citizens, and for other purposes." And by section 6 it was provided that all taxes levied for the purpose of constructing, maintaining, and *operating* said water-works, during the time the precinct might exist, should " be levied and assessed upon the taxable inhabitants and property of said precinct, and not on any other part of said city." The object, therefore, of con-

structing said works was, to obtain an adequate supply of water within the precinct for extinguishing fires: the expense of maintaining and operating, as well as of constructing the works, is to be borne by the precinct: and in the absence of any express authority in the act for reimbursing the precinct for water used by the fire department, it would seem that the legislature intended, when it provided that the works should be operated and maintained at the sole expense of the precinct, that the other portions of the city should be exempted from every and all expense growing out of their construction and operation; —and if this be so, it clearly follows that this appropriation, of which the plaintiffs complain, is unauthorized and illegal.

For reasons explained by my brother LADD, I think the collection of this tax should not be restrained.

The defendants should be restrained by injunction from paying out of the city treasury said sum of $7,400, or any part thereof, for interest upon the bonds or notes issued to cover the cost of constructing or maintaining the water-works of the city, or for any expense or cost arising from constructing, maintaining, or operating said water-works.

The prayer for a decree to restrain the defendants from collecting said tax is denied.

LADD, J.   The great question is as to the true construction of the act authorizing the city of Concord to establish water-works in said city, approved June 30, 1871.   By the first section of that act, the city of Concord is authorized to construct, manage, maintain, and own suitable water-works in said city, for the purpose of introducing into and distributing through the more compact parts of said city an adequate supply of water for extinguishing fires, and for the use of its citizens, and for other proper uses.

By section 5, "Said city is also authorized and empowered to contract with individuals and corporations for supplying them with water, and to make such contracts and to establish such regulations and tolls for the use of water as may from time to time be deemed proper," &c.

By section 6, "Said city is also authorized to borrow such sums of money, on the credit of the city, as may from time to time be deemed advisable, for the purpose of defraying the expense of constructing, maintaining, and operating said water-works, and to issue notes or bonds of the city therefor, *  * and also to levy such taxes as may at any time be deemed advisable for the same purpose, or for paying any sums borrowed therefor, as aforesaid; and said city, if it shall so elect, may, at any time before commencing the construction of said water-works, establish and fix, by proper boundaries, a water precinct in said city, and including such parts thereof as may be thought proper  *  *  ; and all taxes levied, as provided in this section, during the time said water precinct shall exist, shall be levied and assessed upon the taxable inhabitants and property of said precinct, and not on any other part of said city, in the same manner as provided by law for assessing taxes within the gas precinct in said city," &c.

The defendants, in their answer, admit that the city, on the fourth day of April, 1874, by its city council, voted to raise the sum of $59,000 to defray the necessary expenses and charges of the city for the ensuing year, and appropriated $7,400 thereof for water for the fire department; and that the intention was and is to pay out all of that sum to the board of water commissioners for water for the fire department of the city, and for no other purpose whatever. And they claim that under the act this may well and legally be done, while the plaintiffs contend that it is a mere evasion—an attempt to do in an indirect way what they are forbidden by the act to do at all.

It is said, in the first place, that by the act the city corporation and not the inhabitants of the water precinct own the water-works; that it is absurd to say the city can contract an obligation to itself for the use of its own property; and that it is no better than a farce to make an appropriation to meet a want that is already supplied, and the expense of which has been already met in the financial arrangements whereby the water-works were constructed and are to be maintained.

This point is met by the defendants with the reply, that although the legal title to the water-works is in the city corporation, still, inasmuch as those works are to be paid for and maintained by taxes levied exclusively upon the taxable inhabitants and property of the water precinct, a trust results in favor of the inhabitants of the precinct, which a court of equity should recognize and enforce; and hence, that there is no legal objection to establishing a rate to be paid by the city for the use of property thus held by it upon an equitable trust. If the case were to turn on this point alone, I might hesitate before deciding against the claims of the city on the sole ground that they cannot contract a legal obligation for the use of their own property. There certainly seems to be force in the suggestion, that although the legal title may be in the city, still the beneficial ownership ought to be regarded as in the inhabitants of the precinct, although the precinct is not a body having such organic or corporate existence that it can either hold property or enter into contracts with respect to its disposition or use. It is not necessary, however, to consider this point, or to determine whether this somewhat anomalous creature, brought into existence by the act of the legislature and the subsequent action of the city, can be invested with rights of property,—such as to entitle it as an aggregate body to a standing in a court of equity for the protection of those rights.

The act provides, in terms entirely plain and unequivocal, that, in case a water precinct should be established before commencing the construction of the water-works, all taxes levied, as provided in the first part of section 6 of the act—that is, all taxes to defray the expense both of constructing and maintaining the water-works—shall be levied and assessed upon the taxable inhabitants and property of said precinct;—and this, as it seems to me, is the end of the case.

The argument has been pressed upon us with great ability and force, that the construction of this provision contended for by the

plaintiffs would work great injustice to the inhabitants of the precinct, inasmuch as the duty of furnishing water for the use of the fire department of the whole city is one that by law as well as in equity rests upon the whole city; and that to cast this burden entirely upon the precinct so far as regards the wants of that part of the city, and still leave the precinct subject to its proportion of the burden of supplying water for the same use in other parts of the city, is unequal and unjust,—the manifest effect being to relieve one part of the city of its legal burdens by casting them upon another part.

The field of inquiry suggested by this argument is very broad. Let us suppose a case not dissimilar, it is presumed, to the present. A city corporation consists of eight wards, four of which comprise the compact part of the town, and the remaining four cover a large amount of territory in the country immediately outside. In the first four wards, a large amount of property in the shape of buildings is concentrated upon a comparatively small area. The buildings are expensive, the liability to fire great, the rates of insurance, consequently, high. In the other wards, which, it may be supposed, have an equal valuation, more or less, the buildings are less expensive, and so widely detached from each other that, as a general rule, the destruction of one by fire does not greatly endanger others. The rates of insurance may be less, in the proportion of 1 to 6 or 8, or more. The rates of insurance furnish some indication of the supposed liability to fire, and the liability to fire would not seem to be an inequitable criterion whereby to determine the proportion which each property-holder ought to bear in providing the means for extinguishing it.

This does not amount to a full answer to the defendants' argument as to inequality, because the fact still remains that the inhabitants of the water precinct must bear the whole burden of furnishing water for the use of the fire department within the precinct, and also their proportional share of the same service for the outlying wards, whatever that may be; but it does show that the inequality is by no means so great as would at first appear, and that a strictly equitable adjustment would involve inquiries of a semi-public or political character quite as appropriate, to say the least, for the legislature as the court. But however that may be,—however the equities might appear to stand, upon a full and careful examination of all the rights and interests, public as well as private, that should be considered in arriving at a just solution of the problem were the whole matter open for our determination here,— I cannot but regard all inquiries of that sort as precluded by the plain terms in which the statute is expressed. The city is authorized to build and maintain water-works, among other things, for extinguishing fires. Then the whole burden is expressly thrown upon the water precinct, and no change is made in the object for which the works may be maintained. They are to be maintained for the purpose of supplying water to extinguish fires in the city, just as much in case a water precinct is established as though it were not.

The legislature and the city undertook to adjust the equities between

the compact and outlying portions of the city in establishing the water precinct, and providing how the works should be maintained; and I think this appropriation of $7,400 from the public funds of the city for water for the fire department was but an indirect way of throwing upon the city a portion of the burden of constructing and maintaining the water-works, which, by the act, is placed upon the precinct; that it was therefore illegal, and cannot be sustained.

The first prayer of the bill is for an injunction restraining the city, its agents, &c., from paying out any part of said sum of $7,400 for interest on the water bonds, or for cost of erecting and maintaining the water-works, &c.; and I am of opinion that an injunction may and should be granted, according to the prayer of the bill. As to money in its treasury, the city corporation is in the nature of trustee of the inhabitants of the city, and must apply it to the purposes for which they were incorporated. This furnishes one ground on which a court of equity may interfere. Further: if without fraud the corporation should misappropriate the trust fund, which by the admissions of the answer they propose to do here, it is not plain what remedy at law the tax-payer would have. Upon one or both these grounds courts of equity, in this state and elsewhere, have generally taken cognizance of cases of this sort, and granted relief by way of injunction to prevent the misapplication by municipal corporations of the corporate funds. *Brown* v. *Marsh*, 21 N. H. 81; *Barr* v. *Deniston*, 19 N. H. 170; *Merrill* v. *Plainfield*, 45 N. H. 126; *New London* v. *Brainard*, 22 Conn. 552;—and see Dillon Mun. Corp., sec. 732, *et seq.*, and cases cited in notes.

The second prayer is for an injunction to forbid the collection of the tax against the plaintiffs—Brown, Amsden, Holden, and Tallant— towards raising said sum of $7,400. I am of opinion that this prayer should be denied, for the reason that in case the petitioners suffer damage by the collection of a tax illegally assessed against them, they have, under the circumstances here shown, a plain and adequate remedy at law. The state of authority on this question, in this state, is not very satisfactory. I do not find that it has been considered in but two cases, and those cases, as I understand them, are not to be reconciled.

In *Barr* v. *Deniston*, 19 N. H. 170, an injunction seems to have been granted to restrain the collection of a tax illegally assessed against the inhabitants of a school district; while, in the recent case of *Savings Bank* v. *Portsmouth*, 52 N. H. 17, it was held that " This court has no jurisdiction by bill in equity to restrain a town, or the collector thereof, from the collection of a tax which is illegally assessed, as the party has a plain and adequate remedy at law."

*Barr* v. *Deniston* was not referred to by counsel or the court in *Savings Bank* v. *Portsmouth*, and was probably overlooked. The question is not much discussed in either case.

The head note to *Brown* v. *Marsh*, 21 N. H. 81, to the effect that the officers of the town were restrained by injunction from collecting a tax which was held to have been illegally assessed, seems to be entirely

unsupported by anything that appears in the case, and contrary to the fact, as shown by the report of the case. The substance of the bill is given, and the prayer was, " that the defendants may be enjoined from paying to the tax-paying polls any greater sum than the interest of the unexpended balance of the surplus revenue, or from allowing to them, in any manner, the sums set against their names respectively, on the list of taxes in the hands of the collector." The order was in these words : " The judgment of the court is, that an injunction issue, according to the prayer of the bill."

This shows that the case is a full authority sustaining the jurisdiction of equity to restrain an illegal appropriation of the public funds by municipal officers, but no authority for the further proposition that the collection of a tax illegally assessed will be restrained at the suit of an individual tax-payer.

So *Merrill* v. *Plainfield*, 45 N. H. 126, which has been referred to by the plaintiffs' counsel as an authority in favor of restraining the collection of the tax, does not touch that question at all, but merely holds the same as *Brown* v. *Marsh*,—that an injunction will be granted to prevent the payment of money illegally voted by the town.

In this state of our own cases, we are to inquire whether the earlier or the later decision is to be followed.

Judge Cooley, in his late work on Taxation, page 538, says,—"When a tax is assessed as a personal charge against the party taxed, or against his personal property, it is difficult to suggest any ground of equitable jurisdiction. Presumptively, the remedy at law is adequate. If the tax is illegal and the party makes payment, he is entitled to recover back the amount. The case does not differ in this regard from any other case in which a party is compelled to pay an illegal demand : the illegality alone affords no ground for equitable interference, and the proceedings to enforce the tax by distress and sale can give none, as these only constitute an ordinary trespass ; "—and he cites a large number of American cases, from eleven different states—among them *Savings Bank* v. *Portsmouth*—in support of the rule thus laid down. Judge Dillon says,—" The correct view doubtless is, that equity ought not, except for the clearest reasons, to interfere with the speedy and ordinary collection of municipal or other public revenues. If there is no power to levy the tax in question under any circumstances, or if it be assessed upon property not subject to taxation, and the remedy at law is not adequate, a plain case for equitable interposition is made out ; but if the power to levy the tax exist, and the property be subject to taxation, mere errors and irregularities should, according to the better considered view, be corrected on *certiorari*, or other appropriate proceedings, or their effect left to be tested at law : for *equity* ought not to interfere with the collection of taxes, unless the complainant makes a case coming within some acknowledged head of equity jurisdiction,—such as the prevention of a multiplicity of suits, irreparable injury, or where a cloud will be thrown upon his title to real estate." Dillon Mun. Corp., sec. 737.

With respect to the prevention of multiplicity of suits, Mr. Justice Cooley has the following pertinent observations in the case of *Young-blood* v. *Sexton*, 12 Alb. Law J. 266 : " If complainants rely upon the jurisdiction of equity to take cognizance of a controversy when thereby a multiplicity of suits may be prevented, the reliance fails, because the principles that govern that jurisdiction have no application to this case. It is sometimes admissible, when many parties are alike affected or threatened by one illegal act, that they shall unite in a suit to restrain it; and this has been done in this state in the case of an illegal assessment of lands. *Scoville* v. *Lansing*, 17 Mich. 437. But the cases are very few and very peculiar where this can be permitted, unless each of the complainants has an equitable action on his own behalf. Now, the nature of this case is such, that each of these complainants, if the tax is invalid, has a remedy at law, which is as complete and ample as the law gives in other cases. * * But no other complainant has any joint interest with him in resisting this tax. The sum demanded of each is distinct and separate, and it does not concern one of the complainants whether another pays or not. All the joint interest the parties have is a joint interest in a question of law,—just such an interest as might exist in any case where separate demands are made of several persons. Such a common interest there might be if several persons should give several promissory notes on distinct purchases of a worthless article ; and such there might have been under the former prohibitory liquor law, had demands been made against several persons for liquors illegally sold to them. We venture to say that it would not be seriously suggested that a common interest in any such question of law, where the legal interests of the parties were wholly distinct, could constitute any ground of equitable jurisdiction, when the several controversies affected by the question were purely legal controversies. Suits do not become of equitable cognizance because of their number merely." In this case, it was held that a court of equity has no jurisdiction to restrain the collection of a personal tax; nor will it assume jurisdiction to prevent a multiplicity of suits, where the parties have, severally, remedies at law.

In *Loud* v. *Charlestown*, 99 Mass. 208, the court held that the remedy at law of a person upon whom a tax is illegally assessed by a town or city is plain, adequate, complete, and exclusive, in event of the collection of the tax, and that the court has not jurisdiction in equity to restrain such collection ;—see, also, *Dodd* v. *Hartford*, 25 Conn. 232, and other cases cited in Cooley on Taxation, *ubi supra;* also, Hill. on Injunctions 458, and cases cited.

" In the case of *Taylor* v. *Secor*, and two other like cases, the supreme court of the United States has just decided—October term, 1875—the following points :

" 1. While this court does not lay down any absolute rule limiting the powers of a court of equity in restraining the collection of taxes, it declares that it is essential that every case be brought within some of the recognized rules of equity jurisdiction, and that neither illegality

nor irregularity in the proceedings, nor error, nor excess in the valuation, nor the hardship nor injustice of the law, provided it be constitutional, nor any grievance which can be remedied by a suit at law, either before or after the payment of the tax, will authorize an injunction against its collection.

" 2. This rule is founded on the principle that the levy of taxes is a legislative and not a judicial function; and the court can neither make nor cause to be made a new assessment, if the one complained of be erroneous;—and, also, in the necessity that the taxes—without which the state cannot exist—should be regularly and promptly paid into its treasury."* 13 Alb. Law J. 331.

These authorities, and the reasons upon which they rest, are quite conclusive, to my mind, that the rule, as laid down in *Savings Bank* v. *Portsmouth*, is the correct one, and that we should follow it in the present case. It is not necessary to go any further;than to hold that upon the facts appearing in the present case the plaintiffs are not entitled to an injunction restraining the collection of the tax, for the reason that, in case the assessment of which they complain turns out to be illegal, the law furnishes them a plain and ample remedy for the mischief they apprehend.

CUSHING, C. J., concurred.

*Decree accordingly.*

---

* " These reasons, and the weight of authority by which they are supported, must always incline the court to require a clear case for equitable relief before it will sustain an injunction against the collection of a tax which is part of the revenue of a state. Whether the same rigid rule should be applied to taxes levied by counties, towns, and cities, we need not here inquire; but there is both reason and authority for holding that the control of the courts, in the exercise of power over private property by these corporations, is more necessary, and is unaccompanied by many of the evils that belong to it when affecting the revenue of the state." *Taylor* v. *Secor*—MILLER, J.

REPORTER.